May it please the Court, Brad Foster of Andrews Kurth for the Alguire Appellants. This is the third appeal addressing my client's motions to compel arbitration. In the last appeal, this Court rejected the receiver's argument that he stands in the shoes of third-party creditors, and it remanded the case back to the District Court to consider a single question, whether the receiver is bound to the arbitration clauses if he sues as he must on behalf of the Stanford entities. On remand, the District Court acknowledged that the receiver's claims are derived from the arbitration agreements and found that the arbitration agreements are valid. That should have ended the inquiry. The arbitration agreements are valid and enforceable. The receiver is bound to them because he stands in the shoes of the entities. That was the point of the prior appeal, and it's consistent with unanimous decisions from other circuits limiting the scope of a receiver's standing and enforcing arbitration agreements against federal receivers. Nevertheless, the District Court— What do you say to Judge Posner's opinion in Shoals? In Shoals, Judge Posner created an exception to the receiver's standing, which permits him to avoid imperi delicto for the purpose of pursuing fraudulent transfer claims on behalf of creditor entities. And Shoals and Trillstrup and Wollinger and Eberhardt stand for the proposition that a receiver may pursue fraudulent transfer claims on behalf of creditor entities, may not pursue fraudulent transfer claims on behalf of individual debtors if there are no separate entities. But Shoals does not go beyond that. It does not eradicate the imperi delicto doctrine. It does not permit a receiver standing to sue on behalf of creditors otherwise. It does not permit a receiver to sidestep the debtor's obligations. Eberhardt, Shoals, and all the other cases that we cited in the last appeal stand for the proposition that a receiver has no greater rights or claims than would exist for the debtors themselves. And three courts have specifically held that a receiver is bound by the debtor's arbitration agreements. The Javits Court in the Sixth Circuit, the Capital Life Court in the Tenth Circuit, and recently the Weyand Court in the Eleventh Circuit, which considered the Nadel Ponzi Scheme receiver, another SEC-appointed receiver, who argued just like the receiver here that the receivership law should trump the Federal Arbitration Act. It is, it could override it, and he should not have to litigate in arbitration. The Weyand Court said no, that the Federal Arbitration Act is a congressional command. There is no contrary indication that receivership law should bind that. I thought in the Eleventh Circuit case that the receiver was arguing that he did not, that there were entities that he was representing, all of them, but they did not have to show that that in and of itself provided the nexus to the underlying transaction. And the Eleventh Circuit said no, you don't have that, you've got that in the absence of it. If those entities that you represent have no connection with them, then you can't proceed. I thought that's what the Eleventh Circuit said. Well here in the, the receiver stands in the shoes of Stanford Group. That's what this court said in Aguiar 3. It was Stanford Group that, that paid the employment compensation to my clients that the receiver is seeking to recover. I thought you were saying the Eleventh Circuit is following right along and, and joining those that really sort of a non, not disagreeing or, or at least agreeing with your reading of the, of Scholl's. No, I don't think the Eleventh Circuit addressed Scholl's. I think the Eleventh, Eleventh Circuit was addressing the question of whether a receiver can avoid arbitration. It did not. It's misunderstood your argument then. Well in, in that case I apologize if there's any miscommunication. The district court did not hold that the agreements are unenforceable as a receiver. The district court held that the receiver can simply reject the arbitration agreements or for policy reasons that receivership simply trumps the Federal Arbitration Act and the receiver doesn't have to follow that. As I've said, three appellate courts have already held specifically that receivers are bound by the debtor's arbitration agreements. So if this court were to follow the district court here, it would stand alone and there would be a circuit conflict. No other court has given a receiver the power to reject an arbitration agreement. It's fundamentally inconsistent with Javitsch and Capital Life and beyond. It's inconsistent with the Hayes decision from the Third Circuit in which the Third Circuit said a bankruptcy trustee must arbitrate debtor-derived claims. A little different way, a little more direct way from my thinking anyway. How do you, what do you say to the argument that, that these particular agreements, arbitration agreements issued in forms of, took various forms, notes and obligations to, to people who ultimately were participants in the fraud, that having these particular agreements furthered the Ponzi scheme and for that reason alone should not be, should not, having further been used to further the, the, the fraud and the conspiracy here, that they should not be enforceable? Well, I have two responses to that. The first is that the Supreme Court's decision starting with PrimaPaint have said that a fraud assertion like that, that is directed to the contract as a whole and not the arbitration agreement. I'm suggesting to you that going to the heart of the, the arbitration agreement itself and I'm suggesting to you that PrimaPaint won't help you because this fraud involved the actual, it was part of the argument is that, that the agreement to arbitrate itself, not just the overarching employment, that agreement itself is tainted because it was, it was part and parcel of a Ponzi scheme. Without those people marketing this stuff, you wouldn't have been able to get off ground zero. Again, I have two responses to that. The first is that the 11th Circuit specifically rejected that theory, saying that you cannot say the agreements are bogus in total and avoid arbitration on those grounds. And they cited PrimaPaint in other cases. The second is that we are relying not simply on Stanford internal contracts. Let's stay with that point just a minute, if you will. The 11th Circuit says that. Why do you, why is, this is not a fraud that goes to the, to the, to the creation of some overarching contract that has a free, has an independent internal arbitration agreement. The arbitration agreement itself can be seen as, as a, as a, as a, as an effort to gain private resolution of an ongoing fraud. If there's trouble, you get private resolution, and that perpetuates the fraud. The principal arbitration agreement that we rely on is not internal to Stanford. It comes from FINRA's nationwide framework of regulation governing U.S. broker-dealers. FINRA is the regulatory arm of the New York Stock Exchange and NASDAQ. It is supervised by the SEC. Its code of arbitration procedure is monitored and controlled through the rulemaking process of the SEC. That's where the arbitration obligation is found. And this court- I understand that, but I don't, I, but your argument is, you're, you're, you're, you want to rely upon PrimaPaint, which, which addresses a, the, the, the longstanding before arbitration became so popular, PrimaPaint had made it quite clear that, that the agreement to arbitrate was a separate entity, in effect, separate obligation, separate from the overarching contract itself. So that's the question. It's whether that particular agreement to arbitrate itself, not the overarching, was, was an incident of fraud, that, that the source of the arbitration agreement, uh, uh, uh, rests somewhere else, only moves you further away from PrimaPaint. Well, the negotiation of the arbitration provision, it was, is contained in the FINRA rules. There were no negotiations on arbitration between my clients and the receiver. There was no fraud relating to that. And every circuit court that has upheld arbitration agreements against receivers could have made that same argument. Receivers are always asserting that, uh, the underlying debtor's obligations are bogus, and therefore, they've come in as receivers, and they're pursuing fraudulent transfer claims. But the Eleventh Circuit, the Sixth Circuit, the Tenth Circuit have rejected that. This court in National Gypsum and Gandy, in fact . . . Did they reject that, or did they just not address that, the, most of the circuits? Are we talking about the rejection argument? No court has ever permitted a receiver to reject an arbitration agreement. Right, but they didn't analyze it. And many of the cases haven't analyzed that point. Primarily because that power doesn't exist in the law. It's the, the district court relied primarily on law review articles and 100-year-old railroad cases to craft a rejection theory, but that rejection theory really has no support in modern receivership law. And it isn't supported by bankruptcy law. A bankruptcy trustee can reject arbitration in this court's jurisprudence only for core bankruptcy claims derived from the bankruptcy statute. It cannot do it for debtor-derived claims. And that's really the point on the trumping of the Federal Arbitration Act. Unless there is a specific contrary congressional command, it is not possible for policy or jurisdiction to ignore a statute requiring arbitration and avoid arbitration on the various policy theories that the district court articulated and the receiver is articulating here. I'm not really clear, and I need to, should have studied this more carefully. Who is the receiver in this particular complaint that's before, that was live in the district court? Who is the receiver representing as a plaintiff? In the last appeal, he purported to be representing third-party creditors. This court said— Okay, go ahead. Which, which Stanford entity? He now claims that he is seeking to represent Stanford International Bank separately from the other Stanford entities. The district court rejected that theory because, for multiple reasons. One, it was Stanford Group Company that made the transfers, and the district court held, consistent with the 11th Circuit and beyond, that the receiver would not have standing to pursue claims on behalf of SIB when it was SGC that made the transfers. Second, the court held that the receiver has consistently and repeatedly argued a single business enterprise, and he cannot pick and choose now which entity he wants to sue on In another context, he has insisted that the entities be treated together. That either means that the receiver is judicially stopped from making that argument, or the district court had the clear discretion to make that determination. That argument is made by the receiver, is essentially a counter-appeal here. It is subject to a different standard of review than the rest of this case. Our claims are subject to de novo review. The receiver's alter ego challenge is subject to a clearly erroneous standard. And we believe the district court had ample evidence to support his decision that the receiver cannot pick and choose amongst the various entities and seek to sue only on behalf of SIB. Is there an affiliates clause in your client's documents that would capture SIG, even if there's no single enterprise? Yes. In fact, there are. There are multiple common law theories as well as an affiliates clause in my client's promissory notes that capture affiliates. SIB also was a third-party beneficiary. I know you argued that. I'm talking about the clause itself. Yes, there is. There is an affiliates clause in the promissory notes, which is reflected in our brief. I see that I'm out of time. May it please the Court. I represent Appellant Mark Tidwell, whose concerns are separately briefed and acknowledged in part in a lengthy footnote on the last page of the district court's order underneath the signature of the judge, where he denies the motions to compel arbitration. The footnote is factually inaccurate and leaves out a very important fact, and that is this, that Stanford initiated a FINRA arbitration against Mark Tidwell, seeking the same relief that's being sought by the receiver. The district court failed to acknowledge that in the footnote, and that makes a significant difference. What is important is that Stanford then took a position regarding arbitrability that the receiver today wishes to reject. We contend that the receiver is judicially stopped from taking a contrary position. There are two important consequences of Stanford's initiation of the arbitration in 2008. One, incorporation of the Code of Arbitration Procedure in the Form U-4 clearly and unmistakably constitutes an agreement to arbitrate arbitrability. And secondly, during the arbitration proceedings, no party may bring any suit, legal action, or proceeding against any other party that concerns or would resolve any of the matters raised in the arbitration. I cite FINRA Rule 13209. The maintenance of the receiver's claims against Tidwell in federal court is precluded. Now, the FAA does not permit a federal court to allow a receiver to reject a contract to avoid arbitration unless a defense to arbitration relates specifically to the arbitration agreement. It must be submitted to the arbitrator, not to the court. As part of the underlying dispute, I cite Primerica Life Insurance v. Brown out of this court. What are we to make of the exclusive jurisdiction language in the federal statute regarding receivers? I'm sorry, ma'am, I couldn't hear you. What are we to make of the exclusive jurisdiction language in the federal statute regarding receivers? Are you speaking of Section 754? Yes. I don't believe that extends to the district court. I think Weehan and other cases have said that that does not extend to the judge, only to the receiver himself. And I don't believe that the district court has the jurisdiction that the district court says that it has in its order. I think the Federal Arbitration Act and all of the Supreme Court cases interpreting it suggest that the district court has no discretion and therefore no authority to assume to itself the jurisdiction that it says that it has. I'm unclear why it's a contrary position. I don't think—I'm not sure the receiver is taking a contrary position. They're not talking about whether the language says it's arbitrable. They're saying that they're seeking to avoid the arbitration altogether. And so that's not a—they're not taking a position regarding the language of the arbitration agreement that's different. What's important there is who gets to decide. And we suggest, we contend, that the arbitrator decides that. I cite Buckeye. I think Buckeye is dispositive of that point entirely. But if the whole position is that arbitration is inappropriate because the arbitration agreements themselves are part of the evil scheme, much like the Brown and the Democratic, whatever, senatorial committee, then it's not the arbitrator's position to decide that. I disagree. OK. Can you tell me why? Because the arbitration agreements exist. Where does jurisdiction lie when you have an existing arbitration agreement? Does it exist in the district court? I say not. I say the Supreme Court has announced several times that in the first instance, the arbitrator gets to decide that question. And again, I cite Buckeye. Buckeye is very clear on that point.  Let me ask you a question. Suppose we have a situation with a manufacturer and distributors, and the two manufacturers and the distributors engaged in a contract, and it has an arbitration clause in it. And pursuant to that contract, they are indicted and tried for price fixing, felony. And they say, well, and then they're sued about the treble damages for people, consumers, and the price fix. And they say, well, there's an arbitration clause there. This has to be decided by an arbitrator. There's an arbitration clause in this contract, and that it was used as an instrument to violate the antitrust laws, and the felony is too bad. Arbitrators got to decide. And whether or not who's entitled or what. In the face of that type of fraudulent use, you say that an arbitrator decides it. In other words, we're going to privatize fraud. We're going to move outside the courts criminal conduct. There's got to be a limit to that. And what is it? Under your theory. There is no limit. It's just two crooks can agree to arbitrate, and you have at it. It's enforceable. That scenario is well outside the facts of this case. There's no crime alleged. Of course it is. Of course it is. But I'm trying to test the limits of your argument of arbitration here. Of course that's not this case. But implicit in what you're saying, it's different there because there's fraud, and it's very clear. But my question to you, if these particular agreements, which contain an arbitration clause, were instrument of the Ponzi scheme itself, you nonetheless are going to require that the question of the consequences of that be determined by arbitration. And so you give the people, you give the crooks the benefit of a deal to privatize the consequences of their fraud. Now, that may be the law, but that seems to be what you're arguing. I don't think so, Your Honor. Well, tell me why not. First of all, the idea of crooks, I'm not sure who the crooks are in your hypothetical. My client is certainly not. Well, I don't think there's any hypothetical in our situation on that score. We have people serving prison terms for it. Right. My client is not among them. I understand that. But the question is how these particular people who were being paid were participating in a Ponzi scheme, in fact. Right? Do you agree with that? I think that's an open fact question. There's been no finding that my client has participated in a Ponzi scheme. Well, knowing or not, it's a different question. But were they employed by these entities? Yes. And what was their job? My client was a financial advisor up until a year before the SEC stepped in. That is correct. Now, if we're going to impose a legal fiction and argue that he is guilty of a fraud merely because he was employed in the hope of rejecting the underlying arbitration agreement, I don't think the case law supports that argument. I don't think the Supreme Court of the United States accepts that. Well, but the question of whether he participated in a fraud is to be arbitrated? I don't think that's what's before the arbitrator. I think what the arbitrator has to consider in the first instance is whether or not it's a valid arbitration agreement. And Buckeye says the arbitrator gets to decide that. No, Buckeye says that the arbitrators get to decide the validity of the overarching contract, not if you're only challenging, I thought, the arbitration clause itself, then the court's got to decide in the first instance whether the arbitration clause is valid. There's a distinction there, I thought. And I haven't read Buckeye in a while. Well, the receiver is not challenging the underlying arbitration agreement. He's only rejecting, purports to reject, the contracts as a whole, the notes and the force. Why are they not obligated to pay those? Why would you think they're obligated to pay the people who were furthering the conspiracy? Why would my client not be obligated to pay? No, no, why are they entitled to be compensated for conduct that furthered the conspiracy, whether it was knowing or unknowing? Well, that goes to the merits of the case, and the district court can't even consider that in determining whether or not— The merits of the case are fraud, and what I'm putting to you is this very large question of whether or not that type of fraud, which had already been adjudicated to be criminal conduct—that doesn't mean your client is guilty of a crime, but what they were doing was furthering a crime. And you're saying that what their money that's due under that is subject to arbitration, and the arbitrator just determined whether or not there was—I don't know what they're going to determine. It's already been determined that by definition, their conduct furthered the existence of a Ponzi scheme. Well, Stanford has already made that election as to my client. It initiated arbitration, seeking to recover exactly what the receiver is seeking to recover now. I'm sure Stanford would want—Certainly he wanted private—he wanted to arbitrate these things. Why do you think those—they wanted arbitration, of course. They want private—look, one of the compelling forces in arbitration, the drivers in arbitration in this country, is privatization. They want to get out of the courts. They want privates. They want privacy. I'm not commenting about the wisdom of that or whatever. That's just a fact. The people who agree to that. We know that. And if it happens that the person who really wants the privacy is part of a scheme, then we shouldn't be surprised that we want to arbitrate this and appoint the arbitrators. I'm not hearing an answer. I'm not giving you a chance to. I'll subside. But I don't understand your argument. Dismiss it with a primal plaintiff. I'm just not sure. That doesn't satisfy me, but maybe it does my colleagues. I appear to be out of time. Well, I'll give you an extra time to answer my question. If you have further comments about it, I'm not trying to cut you off. Thank you, Your Honor. I did not mention primal plaintiff. I think my colleague is the one who argued primal plaintiff. Fairness, that's right. But that's what happens when you divide argument. Sometimes you get the ball where you don't want it. But if you want to defer to him, that's fine. Yes, I'm going to defer in his rebuttal. I'm being unfair to you and picking on you about primal plaintiff. I don't mean to be that. And I enjoy being picked upon.  Okay. Good morning, members of the Court. A number of questions I want to get to. But let me start first with what I think is the straightforward resolution of this appeal, which is actually the second issue in our brief that we brought to you. And I think it resolves just about all the questions that have been raised, which is there's not a binding agreement to arbitrate, not one that's binding on this receiver. And we know that because Scholz, as adopted by a panel of this circuit, says the following. When these companies were being run and dominated by Alan Stanford, what they did, their actions were coerced. That's the word that's used in Scholz, coerced. Once that coercion is removed, removed by what? The appointment of Mr. Janvey, things change. What changed? These companies now become, they're no longer alter egos. They're no longer a criminal single enterprise. They become standalone, separate legal entities with their own rights, their own responsibilities. We know from the United States Supreme Court that arbitration, just like any other contract, arbitration contracts don't exist on some pedestal in some, you know, high place in the mountains. They're just like other contracts. And we know the Supreme Court says arbitration is a matter of consent. Which of the agreements do not have facilities language, I mean affiliates language that would capture SIG? I'm assuming you're arguing we're just sitting on behalf of SIG and nobody else. Is that your position? No, Your Honor. And let me complete that thought because it answers your question. Arbitration is a matter of consent, not coercion. And Shoals says that the actions of these entities, while they were dominated by Alan Stanford, were coerced. Coercion and consent are polar opposites. What we say is we are bringing a lawsuit on behalf of the bank. The bank is now a standalone legal entity with its own rights and responsibilities. What is one of those rights? Under Shoals, as adopted by the political committee's case, they're a creditor. They have a claim. They have an SIG. No, no, Your Honor. SIB is the bank. SGC is the brokerage company. Right. And I'm a... So you're sitting on behalf of solely SIB. Is that your position? That is, that is absolutely correct. The bank is the creditor. That is what the political committee's case says. Who is the debtor? Remember, in a fraudulent transfer case, you've got three parties. Somebody has to be the debtor. Somebody has to be the creditor. I agree with you that SIB is affiliated with SBG, Your Honor. And let me address that. Because the bank is suing here. Why are they allowed to sue? They're allowed to sue because they have a claim. A claim against whom? Alan Stanford. Remember, this whole thing was created as we adopted the Shoals case. We're treating Alan Stanford as the debtor, as the one who made the transfers. And that makes perfect sense. Why? Because when he was in charge, he was using all these companies illegally as his tools, as a conduit. That's why we say, that's why we say the brokerage company, the immediate employer of these defendants, what was that brokerage company? It was a mere tool, a mere conduit to funnel money from the bank into the pockets of these financial advisors. It's been the law for a long, long time in the matter of CUDI, it's a 984 Fed Third opinion, that in fraudulent transfer law, if what the debtor does is he transfers money, it passes through an entity and into the pockets of the true transferee. And that's the claim. I agree. You don't need to join SGC to get at the employees. I agree with that. My question is, you are representing SIB, and does the language of any or all of these agreements capture SIB because of the affiliation? That's my, it's a simple question. No, for two reasons. The first reason is the bank never agreed to be bound by anything. It was coerced. No, coercion arguments aside, I'm asking a pure contract question. We can argue about coercion, all of that. Which, if any, of these agreements don't capture SIB based on affiliates or language? As we explain in our brief, I don't think the simple word affiliate is enough to capture the bank. That is our position. The contract, separate and apart from the U4, the contracts do purport to cover all Stanford entities, including affiliates, and then they use another water plate language. Our position, which we lay out in the brief, is that is not enough. But remember, Your Honor, that— Wouldn't you say that's enough in any normal case? I'm sorry, Your Honor? Wouldn't you say that's enough in any normal case, that affiliates is broadly construed and would include this, and this is an affiliate? I don't—it seems like in a normal case, you'd be arguing the opposite. And if we were in a normal case, perhaps we would, but this is not a normal case. But that's—now you can talk about why this is a normal case, but the language says what it says, and you're saying we should not give effect to that because of coercion, all this, this, and this. Yes, Your Honor. I'm just trying to get, first and foremost, you said, aside from the U4, I thought the rules also would catch— No, Your Honor, and here's why, because— You make that statement, there's no footnote or anything else in your briefing. I want to understand that. I apologize. Because if we're looking now at the U4, separate from the contract, the bank is not a member, and it's only members who are brought in by the FINRA scheme of arbitration. The bank wasn't a member. It's never a member. They don't contend it was a member. So that's off to the side. And I have to say, regardless of whether the affiliate language captures the bank or it doesn't, the normal rule doesn't apply. Why? Because all of that is out the window. When Allen Stanford was running these companies, it was a single enterprise. The legal distinctions between the companies were ignored. Formalities were ignored. The law was ignored. All of that changed when Mr. Janvey was appointed. And let me be clear about this, because what's at stake here, I have to tell you, this case really isn't about arbitration. There is something far more fundamental at stake in this appeal, and it is the following. Are we going to impose upon Mr. Janvey, bind Mr. Janvey to contracts, obligations, and decisions of the convicted criminal, Allen Stanford? Because their rule that they are proposing to you, which they say repeatedly in their briefs, has no exceptions. All contracts, all obligations, binding on this receiver. We know that that cannot be the law. How could that be the law, and we have the result in Scholz? How could that be the law, and we have the result in Janvey versus Brown, which says you're not going to enforce a contract if the do-so would further the fraud? These are not collateral agreements. The fraud could not— Those contracts have been performed. You're just now saying I want to carve out the arbitration agreement because it's going to cost me a lot of money to go after these people individually, but there's no basis that I see under traditional Supreme Court cases dealing with, you know, fraudulent inducement of arbitration clauses that puts it in that category. These arbitration clauses were just part and parcel of standard agreements. And the agreements, the overarching agreements themselves may have been tainted with fraud, but I don't see how that goes to the, as the Supreme Court has talked about, the validity of the arbitration clause itself. And I think you brought up this point, Judge O'Rourke. These other cases, including the Supreme Court cases on arbitration, have never dealt with this fact pattern. Well, they've dealt with securities. They've dealt with antitrust. Your Honor— And they've said, you know, outside the criminal context, you're required to arbitrate those claims. The difference here, the difference here is this entire arrangement, including the arbitration clause, including the contracts to pay these enormous bonuses and commissions, was part and parcel integral to the fraud. The fraud could not have worked without it. Well, isn't that going to be an issue in the claim, the suit against the employees? Don't you have to prove that in the suit against the employees? Actually, Your Honor, here's what we have to prove. I think this goes to one of the incorrect points made. In the Fifth Circuit, when we bring a fraudulent transfer claim, if we prove it was payments made from a Ponzi scheme, a fraudulent transfer is established as a matter of law. The fact that this was a Ponzi scheme is now beyond all possible dispute. Then the burden shifts to them to establish the two-part affirmative defense, reasonably equivalent value, but more importantly here, good faith. Good faith, which means, I didn't know, I didn't have any reason to know I was being paid to sell these fraudulent instruments, and I did a fine investigation and satisfied my burden of good faith. That's all that has to be established in our fraudulent transfer case. The comment was made by my colleague about this arbitration that took place before Mr. Janvey was appointed as receiver. I am pretty sure when you look at that complaint, Mr. Stanford was not suing his employee for fraudulent transfer. I'm pretty sure that the record will back me up on that. Mr. Janvey's job is not to simply carry forward the contracts and obligations of Alan Stanford. If that's his job, then I don't know why the SEC going forward would ever ask a court to appoint another receiver. What would be the point if Mr. Janvey is held to every contract, every obligation of Alan Stanford? What would be the point of that? And I ask that because, once again, arbitration, the law of contracts to arbitrate is they are no better, no worse than any other contract. They're not on some high pedestal. So any argument that would knock out another contract knocks out an arbitration contract. You've got to knock out the whole contract, not just the clause. I'm sorry, Your Honor? You've got to knock out the whole contract. And let me speak to that because, again, as I illustrated what we have to prove in our fraudulent transfer case, it is totally outside the bounds of the contract. I agree with you, absent the affiliates clause. I agree with you. No. If there were not, if you weren't, if the bank weren't bound by express language, you don't need to join the SGC or whatever it is to go after the assets. I apologize. I was actually speaking to a different point, which is when you sue for fraudulent transfer, you don't care whether any contract exists. All you're saying is there were payments that were in fraud of other creditors and they need to come back. The fact that they memorialized the payments with contracts isn't a defense. But let me be clear about this. If their rule of law finds its way into an opinion of this court, and that rule of law, as they have put it to you, is every contract, every obligation of this Ponzi schemer is binding on this receiver, what happens in the trial on the merits? We say it's a fraudulent transfer. They say you can't recover. I have a Fifth Circuit opinion that says it's a binding contract. The way I view this is the Supreme Court has always said arbitration clauses are not substantive rights. It's simply a forum selection clause. It's just a question of where and who gets to decide the overarching issues. It's not a substantive right. I agree with that. And the question I'm putting to this court is, and this is backed up by the amicus brief filed by the SCC, why are we dignifying Alan Stanford, the convicted— Why does it, if the Supreme Court said that arbitration are presumed to be neutral forums, there's no reason to believe that arbitrators won't follow securities laws just the same as a court would? So you're—I'm not seeing how an arbitration process, a standard arbitration clause, is tainted by the fact that it is also part of a Ponzi scheme. It is tainted for the reason that Judge Higginbotham mentioned, which is— I respectfully disagree with that position. Let me be clear, because I'm talking about evidence in the record. Well, you don't let the person—you don't let the—you don't—you take the choice of forum away when it's an instrument of fraud. That's what it is. It is neutral, fine. But it's enforcing a choice that exists only because of a contract itself that was an instrument of fraud. And that is exactly our position. And I don't think— Could you help me? Yes, Your Honor. If you're still answering Judge Owen's question, please do so. I did want to come back to that because, again, I think it is critical to understand that if you're going to enforce the arbitration agreement against this receiver, you have to do it on the basis that that contract, like any other contract that Alan Stanford signed, is just as good against Mr. Janvey as it is against Mr. Stanford. And I submit to you that cannot ever be the law in light of the decisions that have already come down from this Court. Well, my question is a related question. How is the requirement to arbitrate an instrument of the fraud? That's what I don't understand. Because it's a normal—this would be—any of these investment companies would have done these agreements and had the same arbitration requirement. Because this is just what the normal investment deal is in that industry, that they have these standard industry contracts. So why is that in furtherance of the fraud? And to understand that, you have to look at the record, which is—our expert put in the evidence on this. Stanford used this broker-dealer arrangement to expand his fraud in a way that before that was not possible. Stanford started this fraud in the Caribbean, selling overseas. But the American market, the U.S. market, is what he needed to get into. It's the broker-dealer arrangement, not the arbitration clause. Well, I'm responding to Judge Elrod's question. How did this come about? Because I don't think you can really understand the context of the answer unless you focus on how did it come about. Why is there even a Stanford Group company that was a broker-dealer? It's because Mr. Stanford needed and wanted a U.S.-based sales force to sell his security into the United States. And so the entire arrangement, which included setting up the broker-dealer, hiring the employees, a contract between the bank on the one side and the broker-dealer on the other side for the bank to pay enormous fees to the broker-dealer. And remember, we're talking about when Stanford ran it. So when the bank is paying enormous fees to the broker-dealer, Allen Stanford is just taking money out of one pocket and putting it into another. But this entire arrangement was to funnel more investors into Stanford to build the fraud. And the arrangement with the brokers had two critical components. One is a wildly exaggerated compensation scheme, which is covered extensively in our experts' reports. But second, to keep any disputes between Stanford on the one hand and his salesman on the other hand out of court. Because when you have court filings, things get noticed, the light gets turned on, and things can become public. And that is why this entire arrangement, you simply cannot, I don't think, appropriately look at this as if this is a dispute over an arbitration agreement, as if it were an employment case or a dispute between two companies. That's not what's going on here. We have a contract between a criminal, convicted criminal on the one hand, and people accused of receiving nearly a quarter billion dollars of money tainted by fraud. It is undisputed that the broker-dealer was insolvent. It only received money through investors that Mr. Stanford funneled in the form of these fees, in this basically illegal contract between the bank and the broker-dealer. And then he put money directly into it. But all the money came from the investors. It was all money diverted out of the bank through the broker-dealer as a mere conduit into the pockets of these salesmen. So the entire arrangement is part and parcel of the fraud. You cannot pick it apart, in my view. You have to look at it for what it is. We're running out of time. Yes, Your Honor. Would we be on shaky ground if we were to consider the fact that the order compelling arbitration would create havoc, as the examiner's amicus brief says, the fact that it becomes unadministrable and creates such chaos, is that if we were to rule that it defeats the whole receivership for those reasons, that can't be an independent ground that we rule just on that ground, can it? So I think all of those facts, and those were facts found by the district court of the cost, the disruption, the fact that there is no way to coordinate this, it will jeopardize the injunction, all of those facts found by the district court I think are relevant to what I'll call the last argument, the Gandhi argument, the policy argument. Can we do that? Or is that way, is that a risky proposition? Your Honor, I don't think it's risky. We addressed the conflict because I believe there is, and I completely disagree with the Wyand case, they didn't address Shoals, they didn't address the key statute here. This is, remember, this receiver, although he's a human being, he's a remedy, and that remedy comes from 15 U.S.C. section 80 of the securities laws that says the Securities and Exchange Commission can come to court and ask the court to take exclusive possession and exclusive jurisdiction of a company like this, and that's what the receivership order says. It says the court takes exclusive jurisdiction and possession, and then, of course, appoints Mr. Janvey because the court is just one judge and two law clerks and can't possibly deal with all this. So is there a conflict? Would there be an independent basis to rule that arbitration should not go forward based on Gandhi? Yes, and I think the reasons put forth by the SEC, the examiner that we have put forth are really unrebutted, but let me finish with where I started because I think the simpler solution is you simply apply Shoals, and Shoals says the actions of the companies were coerced. Coercion is the opposite of consent. There is no agreement to arbitrate, and I'll conclude by just saying my colleague keeps talking about the arbitrator gets to decide the validity of the arbitration agreement. If there's a dispute about the scope, he's absolutely right, but if the argument is, as we are making it, we never signed it, and if you pretend that we did sign it, it was signed under coercion, that's a decision for the court, not an arbitrator, and we ask that the order denying the motion to compel arbitration be affirmed for the reasons we have presented to you. Thank you. I would note that the receiver continues to maintain Stanford Group's membership in FINRA to this day and is obligated to follow FINRA's national rules, which again are SEC approved and govern all U.S. broker-dealers. In response to Judge Higginbotham's questions about PrimaPaint, I think that here it's clear that contracts involving arbitration agreements can be challenged under state law. So under certain hypothetical scenarios, you could have the contracts, the arbitration clauses in particular, deemed to be invalid. PrimaPaint talks about, and Buckeye talks about the ways in which you can challenge arbitration clauses versus the contract as a whole, but that body of law exists. Here, the district court has found that it is undisputed that the arbitration agreements are valid under state law. So there are limits to the scope of the hypotheticals discussed. Those limits don't apply here. Mr. Sadler says that Shoals should bar enforcement of the arbitration provisions, but we're essentially relitigating the last appeal. Shoals also says an equity receiver may sue only to redress injuries to the entity in receivership. Every single circuit to address the issue, that's nine circuits by my count, has held that a receiver stands in the shoes and is bound by the entity's contracts. They have no greater rights or liabilities that the entity would have. I don't understand why that's the last appeal, because I thought that we instructed the district court to consider whether the receiver is bound if he sues on behalf of the state. I thought that was exactly what the mandate was, so I don't understand that that's been resolved. Well, what the court said was, based upon the DSCC2 case, the receiver stands in the shoes and must sue on behalf of the Stanford entities. And the remand was, is the receiver bound by the arbitration agreements under those circumstances if he sues as he must on behalf of the Stanford entities? Right, as opposed to the creditors. As opposed to the creditors, but the court also said stands in the shoes. And yes, he could not step in the side of third-party creditors, but most of the discussion in the last briefing was about Shoals and whether Shoals permits the receiver to step aside and sue on behalf of creditors. Now we're recasting the same arguments in the guise of the receiver can reject arbitration agreements, but— Right, but we haven't decided it as to the Stanford entities. We've only decided it as to creditors. We didn't follow the Algieri 1 approach, and we're down the road now that we have to look at Stanford entities. Well, I have a mandate argument, but I'm not pressing that here because this court certainly knows what its mandate was, and I don't presume to tell the court what it was. But I do believe that to suggest, as Mr. Sadler does, how can the receiver be forced to honor or stand in the shoes of, of arbitration agreements and other contracts is at odds with Shoals and Eberhardt and Woolager and Trollstrop and Donnell and all the cases that have said a receiver has no greater rights or liabilities than the debtor does. Whether the court is on shaky ground, I believe, yes, the court would be on shaky ground to rely on receivership policy arguments to override a clear congressional statute that says arbitration agreements must be enforced. In the D.R. Horton case, this court acknowledged that if Congress hasn't explicitly said that arbitration is trumped by another statute, a contrary congressional command, the Supreme Court has said arbitration must be enforced. And time and time again, when faced with the question of do you have to arbitrate under the 33 Act, the 34 Act, RICO, the antitrust laws, the Supreme Court has enforced arbitration as expressed a strong public policy in favor of arbitration. But are you arguing that the district court's findings that it would wreak havoc are, so to speak, are clearly erroneous? Or are you just saying it's irrelevant? I don't think that I have to satisfy a clearly erroneous standard, but I do agree. What standard do you have to satisfy? It's a de novo review on a motion. So you think the whole thing, so even the factual determinations about how it would affect the receivership? I don't think he made a factual determination, but he certainly adopted or made policy findings, and I think it's subject to a de novo review, but those... So go ahead. But in any event, yes, I disagree that it would create havoc. Arbitration, FINRA is a nationwide framework for arbitration. They handle thousands of arbitrations per year. This is a system that governs all U.S. broker-dealers. But how can they do simultaneous 15-day deals with so many people? They will be individual arbitrations. Generally, it would be individual arbitrations. FINRA has the right to control that. They have a code of arbitration procedure that they follow. Arbitrations would be sent from Judge Godbee, referred to as... It's an ADR forum, much like going to a jury or a magistrate. This court would maintain control at the end of the day to enforce the arbitration awards. Maintain control? What? Well, that... Control of the arbitration award? They're going to have to... Oh. One way or the other, they have to enforce... Magistrate? Yeah, right. No, it's over when the arbitrator decides that there's any practical reason. We know that. That's... I'll follow your argument, but that's a little over the top. Well, I mean, the court does not, under the receivership law, have exclusive control of all litigation. The 754 says that the receiver has the capacity to sue in any district. It gives the receiver jurisdiction over the property. But it doesn't say the receivership court should have exclusive control over every dispute that happens involving the receiver. That's why 754 gives him the ability to go into different districts to protect assets and to proceed with claims. Here, the receiver's going to have to go pursue claims in arbitration. That's what federal law requires. That's what federal rules require. That's what the arbitration agreements require. Are they going to... Is the arbitrator going to decide whether or not these contracts were part and parcel of a fraud? What the arbitrators are asked to decide will depend upon what the receiver and the defendants put together. Let's assume you're right, and this matter is referred to the arbitrator. What do the arbitrators decide? Are they going to decide the enforceability of these claims, or the non-enforceability of the receiver's claims against them? And in incident to that, are they going to decide whether or not that these particular contractual relationships, the entire contract itself, was an instrument of fraud? Are they going to decide that? If the receiver wishes to pursue that argument, certainly the arbitrators under Buckeye have the power to decide whether the entire arbitration... I'm just asking the question of what they're going to decide. That's what they're going to be deciding. Well, in this case, Fender rules are external to Stanford. And so, I mean, I can put myself in the standpoint of an arbitrator. Is the arbitrator bound by the legal, by the determinations that are made that Stanford's guilty of fraud, and the history of this? Are they bound by this? Can they decide afresh? All those questions? Arbitrators are required to follow the law, but the arbitrators will be given some latitude, as is often the case in arbitration, to make determinations as to... They're not required to follow the law. If they follow, don't follow the law, that's often not a basis to not confirm the arbitration. You still have to confirm it as the court. I would agree that manifest disregard is no longer a viable... It's no longer a viable... So the arbitrator could disregard all of the law that's been decided in this case, in this long series of cases. When and if we go to arbitration, the arbitrators will be asked to follow the law. I have no doubt that the receiver will ask them to do that. Whether a particular arbitration panel does, that's essentially the nature of the beast with arbitration. There will be any number of different arbitration decisions and... We can have inconsistency as well, right? We can have inconsistency with jury findings. The receiver is proceeding with jury trials, and they're not always going to be consistent. Cone those if you have inconsistent, but if this, you have a bunch of different arbitration rulings, all you can do is confirm or not, and you can't say, well, it's because it's inconsistent with this other secret proceeding. Well, these essentially are... I mean, these are fact findings. Just taking Mr. Sadler's statement that we're then going to have to argue over good faith, what happened and when and what people knew, those are pure fact findings. There will be and there should be inconsistencies among individuals as to what they knew and what responsibility they may have for it, and therefore how strong the receiver's claims are. I suspect there'll be some sort of continuum that any fact finder would have different results for different people depending on their individual situations. My clients have the right to have the claims litigated as federal rules require, as members of the broker-dealer industry. These are experts. That's why the industry has created arbitration, so that experts in the industry can assess what happened, and... They're experts, and they're experts, I suspect, and securities and those technicalities, I don't know that they're the... Nothing requires no securities expertise to see a classic Ponzi scheme. I mean, that's expertise. I don't know what we really need here. The only issue, I suppose, in the enforceability of those is what they knew and didn't know, those kinds of questions themselves, but that dances past the threshold problem of the rules, and I don't really hear a good answer to that. I think the principal answer is that the Supreme Court has repeatedly said that arbitration does have to be enforced. I understand that the Supreme Court said about arbitration, and you're right, they've been very strong in enforcing arbitration. I'm suggesting to you, though, that that doesn't really answer the anterior question here that's being put to us, which goes back to where we are insofar as those particular agreements are concerning the receiver. It's obligated to abide by those agreements, which also contain an arbitration clause, and the question of whether... I thought it was quite clear under our laws of interpreting property, paint, et cetera, that this can be seen as an attack upon the enforceability of the entire instrument. That coercion, call it coercion, call it fraud, call it the misconduct of Stanford Highways labeled, that goes to the enforceability of the entire instrument. Now, all of your argument rests, it must seem, perhaps I'm just way off, but your whole argument really has got to stand with the ability to leave in place those arbitration agreements regardless of the overall instrument. And it's in a sense that you stand or fall with Prima Paine. Well, I think in either case, Prima Paine and Buckeye all stand for the proposition that the arbitrators ultimately get to decide whether the arbitration agreement's been procured by fraud. And so this is really an issue for the arbitrators to decide. And it presupposes that there is some agreement. Well, certainly FINRA rules, I mean, no one suggests that Stanford committed fraud when FINRA created the arbitration framework. It predates Stanford. It has nothing to do with Stanford. I understand your argument. I'm happy to answer additional questions, but... No, no, you're doing fine. I'm not... We're just kind of beating the same horse.